UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CASTLEWOOD (US), INC., SEATON
INSURANCE COMPANY, and STONEWALL
INSURANCE COMPANY,

                          Plaintiffs,

    -v-

NATIONAL INDEMNITY COMPANY,

                          Defendant.

Case No. 06-CV-6842 (KMK)

OPINION AND ORDER

---

Appearances:

John Francis Finnegan, Esq.
Cadwalader, Wickersham & Taft LLP
New York, NY
*Counsel for Plaintiff Castlewood*

Derrick R. Freijomil, Esq.
Michael Robert O'Donnell, Esq.
Riker Danzig Scherer Hyland Perretti LLP
Morristown, NJ
*Counsel for Plaintiffs Seaton Insurance
Company and Stonewall Insurance Company*

Larry P. Schiffer, Esq.
Leah Mary Campbell, Esq.
Leboeuf, Lamb, Greene & MacRae, LLP
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

      Castlewood, Inc., Seaton Insurance Company, and Stonewall Insurance Company

(collectively "Plaintiffs") seek a preliminary injunction prohibiting National Indemnity

Company ("NICO") from joining Castlewood in arbitration proceedings currently pending

between NICO and Seaton Insurance Company ("Seaton"), and between NICO and Stonewall Insurance Company ("Stonewall").

NICO opposes the preliminary injunction on two grounds. First, NICO contests this Court's subject matter jurisdiction, arguing that Castlewood's requested relief does not meet the amount-in-controversy requirement. Second, NICO opposes the injunction on the merits, arguing primarily that Castlewood has either assumed the obligation to arbitrate through its actions, or that Castlewood should otherwise be estopped from avoiding arbitration. Finally, if the Court chooses to grant the preliminary injunction, NICO requests that the Court order Castlewood to post a bond in the amount of $100 million.

For the reasons set forth herein, the Court grants only Castlewood's request for a preliminary injunction barring it from the pending arbitration.

## I.  Background

A.  The Underlying Agreements

This dispute stems from the interplay (or lack thereof) of three agreements. These agreements are summarized as follows.[1]

    1.    The Reinsurance Agreements Between NICO and Seaton, and NICO and Stonewall

NICO provides reinsurance protection to insurance companies that are in "run-off." (Snover Decl. ¶ 2.) Insurance companies in run-off "have ceased writing new business, but continue to administer the liabilities arising from policies previously written, and continue to collect reinsurance . . . purchased in connection with those liabilities." (*Id.*) On November 20,

---

[1] No Party requested a factual hearing, either in their submissions or at oral argument. Thus, the Court conducted no such hearing, as resolution of the issue boils down to an interpretation of these contracts.

2

1998 and May 9, 2000, NICO entered into separate reinsurance agreements with Seaton and Stonewall, respectively (collectively the "Reinsurance Agreements"). (*Id.* ¶¶ 3-4.) Under the Reinsurance Agreements, NICO agreed to reinsure Seaton for up to $350 million and Stonewall for up to $240 million. (*Id.* ¶ 5.) "As of September 1, 2006, there [was] approximately $190 million remaining on the Seaton reinsurance cover, and approximately $185 million remaining on the Stonewall reinsurance cover." (*Id.*) Castlewood was not a signatory to either Reinsurance Agreement and "played no part in their negotiations." (Wall Decl. ¶ 4.)

The Seaton and Stonewall Reinsurance Agreements contain nearly identical arbitration clauses. These clauses provide that "[a]ll matters in difference between the Reinsured and the Reinsurer in relation to this [Reinsurance Agreement] . . . shall be referred to an Arbitration Tribunal in the manner hereinafter set out." (Wall Decl. Exs. A, C.) The Reinsurance Agreements further provide that any arbitration is to take place in New York City, and be governed by New York law. (*Id.*)

The Reinsurance Agreements create restrictions on the entities that are allowed to become the "Claims Servicer." As defined in the Reinsurance Agreements, the Claims Servicer manages the liabilities and obligations arising from the underlying insurance contracts. (Snover Decl. ¶ 6; Wall Decl. Ex. C, § 4.F.) Under the Reinsurance Agreements, Seaton and Stonewall can only appoint a new Claims Servicer with NICO's written consent, and NICO has a right to itself become Claims Servicer under certain conditions. (Wall Decl. Ex. C, § 11.D.)

    2.  <u>Castlewood's Agreements with Seaton and Stonewall</u>

On January 18, 2006, Castlewood entered into separate agreements with Seaton and Stonewall, each entitled "Agreement Relating to Administration of Run-Off Business" (the "Administration Agreements"). (Wall Decl. Exs. D, E.) Pursuant to these agreements,

Castlewood "was to provide certain administrative services with respect to Seaton's [and Stonewall's] run-off business." (Mem. of Law in Supp. of Pls.' Order to Show Cause for Inj. Relief and Declaratory J. at 4 ("Pls.' Mem.").)  In consideration for providing these services, Stonewall and Seaton each agreed to pay Castlewood approximately $1.8 million annually, through December 31, 2008.  (Snover Decl. Ex. 4.)  As discussed below, there is a dispute between Plaintiffs and NICO as to whether Castlewood's obligations under the Administration Agreements violate certain provisions of the Reinsurance Agreements – specifically, the restrictions on the entities that may serve as Claims Servicer.  However, at oral argument, counsel for NICO conceded that Castlewood's performance of other administrative duties does not violate the Reinsurance Agreements.

The Administration Agreements each include a clause affirming that Castlewood has reviewed the Reinsurance Agreements and agrees to act consistently with such agreements:

> Castlewood warrants that it has read the Reinsurance Agreements in their entirety, that the Reinsurance Agreements create various rights and obligations with respect to the Run-Off Business between [Seaton], on the one hand, and [NICO] on the other, and that Castlewood will at all times cause the services to be performed in a manner consistent with [Seaton's] rights and obligations under the Reinsurance Agreements.[2]

---

[2] This is the text of the Seaton Administration Agreement.  The corresponding section of the Stonewall Administration Agreement is slightly different, but to the same effect:

> Castlewood warrants that it has read the Reinsurance Agreement in its entirety, that the Reinsurance Agreement creates various rights and obligations with respect to the Run-Off Business between [Stonewall], on the one hand, and NIC [sic], on the other. Castlewood agrees to administer the Reinsurance Agreement consistent with [Stonewall's] rights and obligations under the Reinsurance Agreement.  (Wall Decl. Ex. E § 2.2.)

(Wall Decl. Ex. D § 2.2.)  The Administration Agreements also require that all disputes arising out of the Agreements be settled in arbitration:  "In the event that any differences arising [sic] between [Seaton or Stonewall] and Castlewood under this Agreement, such differences shall be submitted to arbitration."  (*Id.* at Exs. D, E § 15.7.)  NICO is not a signatory to the Administration Agreements.

    3.  <u>The Stock Purchase Agreement</u>

Castlewood, through its affiliate, has agreed to acquire Seaton and Stonewall from Stonewall Acquisition Corporation ("SAC").  (Def. Nat'l Indemnity Co.'s Mem. of Law in Opp'n to Pls.' Mot. for a Prelim. Inj. and Declaratory Relief at 6 ("Def.'s Mem.").)  Towards that end, on June 16, 2006, Castlewood entered into a Stock Purchase Agreement with SAC.  (Snover Decl. Ex. 4.)  The Stock Purchase Agreement requires that Castlewood and SAC "each use commercially reasonable efforts to cause Castlewood US to obtain . . . [NICO's] consent to Castlewood . . . serving as the Claims Servicer."  (*Id.* § 5.10.)

 B.  <u>The Arbitration</u>

In January 2006, NICO issued separate arbitration demands to Seaton and Stonewall, seeking documents that NICO believed that it was entitled to under the Reinsurance Agreements.  (O'Donnell Decl. Ex. A.)  In May 2006, NICO amended its arbitration demand to add Castlewood as a respondent to the arbitration and requested that the arbitration panel find that "Castlewood is not authorized to serve as Claims Servicer or otherwise manage any claims for which Stonewall [and Seaton] seek[] coverage under the Reinsurance Agreement."  (*Id.* Ex. B.)  In June 2006, organizational meetings were held before the arbitrators in each matter.  (*Id.* ¶ 4.)

Discovery is currently ongoing in both arbitrations, with fact discovery scheduled for completion by February 2007 (Stonewall arbitration) and March 2007 (Seaton arbitration).[3]  (*Id.* ¶ 6.)

II.   Discussion

A.  Jurisdiction

Notwithstanding that the Complaint clearly alleges complete diversity between Plaintiffs and Defendant, and that the dispute involves more than $75,000, NICO argues that the Court lacks subject matter jurisdiction.  District courts have original jurisdiction "where the matter in controversy exceeds the sum or value of $75,000 . . . and is between . . . citizens of different States."  28 U.S.C. § 1332(a)(1).  Once diversity of citizenship has been established, in order to justify dismissal, it "must appear to a legal certainty that the claim is really for less than the jurisdictional amount . . . ."  *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938); *accord Wolde-Meskel v. Vocational Instruction Project Cmty. Servs., Inc.*, 166 F.3d 59, 63 (2d Cir. 1999).  The Second Circuit "recognizes a rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy."  *Wolde-Meskel*,

---

[3]At oral argument, counsel for NICO had considerable difficulty explaining why Castlewood is a necessary party in the arbitration.  For example, if NICO prevails in the arbitration on the claim that Seaton and Stonewall are barred from permitting Castlewood to act as their Claims Servicer (because NICO had not consented, as is required in the Reinsurance Agreements), then NICO will have obtained all the relief it seeks in the arbitration.  Yet, counsel for NICO indicated only that he "hoped" that such a decision would end the matter, as Castlewood might still "want" to act as Seaton's and Stonewall's Claims Servicer.  In the end, however, counsel for NICO could not explain how Seaton and Stonewall could, even if they were so inclined, ignore an arbitrator's decision barring them from contractually delegating to Castlewood, no matter how strong its desire, the Claims Servicer role over NICO's objection.  Indeed, NICO argued in its papers that Castlewood would in effect be bound by any "decisions of the panels irrespective of whether it appears before the panels." (Def.'s Mem. 11.)  This claim makes NICO's expensive efforts to bring Castlewood to the arbitration a curious endeavor, at best.

166 F.3d at 63 (citation omitted); *accord Maxons Restorations, Inc. v. Newman*, 292 F. Supp. 2d 477, 481 (S.D.N.Y. 2003).

"Where the plaintiff seeks injunctive relief, the value of his claim is generally . . . measured by the extent of the impairment to be prevented by the injunction. In calculating that impairment, the court may look not only at past losses but also at potential harm." *A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 87-88 (2d Cir. 1991); *accord Maxons*, 292 F. Supp. 2d at 481. When the jurisdictional question arises in the context of a petition to compel arbitration, the "'amount in controversy . . . is determined by the underlying cause of action that would be arbitrated,' which is to say, . . . 'the difference between winning and losing the underlying arbitration.'" *Maxons*, 292 F. Supp. 2d at 481 (quoting *Doctor's Assocs. v. Hamilton*, 150 F.3d 157, 160 (2d Cir. 1998)).

NICO does not dispute that the parties are diverse, but argues that "there is no dollar amount in controversy either in this litigation, or in the underlying arbitrations." (Def.'s Mem. 7-8.) In NICO's view, the "two underlying arbitrations address primarily the issue of whether, or how, NICO or the Insurers . . . shall serve as the Claims Servicer under the Reinsurance Agreements; in neither arbitration have the Insurers alleged an amount in dispute." (Def.'s Mem. 9.) This is in large part true.[4] On the record before the Court, the only claim for monetary, as opposed to injunctive, relief is NICO's request that the arbitration panel "order that Seaton and Castlewood reimburse NICO for its reasonable costs and expenses for servicing and managing claims and collecting reinsurance." (O'Donnell Decl. Ex. B.)

---

[4] It bears noting, however, that while NICO claims that there is no amount in controversy, NICO nonetheless requests that the Court order Castlewood to post a $100 million bond to cover "costs and damages [that] may be incurred . . . by any party who is found to have been wrongfully enjoined or restrained." (Def.'s Mem. 17 (quoting Fed. R. Civ. P. 65(c).)

However, the Court must also measure "the extent of the impairment to be prevented by the injunction." *See A.F.A. Tours*, 937 F.2d at 87-88 (citations omitted). Because Castlewood seeks to enjoin an arbitration, that impairment is "'determined by the underlying cause of action that would be arbitrated.'" *Maxons*, 292 F. Supp. 2d at 481 (quoting *Doctor's Assoc.*, 150 F.3d at 160). Here, as part of its arbitration demand, Castlewood's view is that NICO is seeking to enjoin Castlewood from carrying out certain of its obligations under the Administration Agreements. (*See* O'Donnell Decl. Ex. B (requesting that the arbitration panel "order that Castlewood shall cease and desist any involvement in claims servicing or management [of claims covered by the Reinsurance Agreements.]").) Seaton and Stonewall are compensating Castlewood for its services under the Administration Agreements at a combined rate of approximately $3.6 million per year, with two years remaining under the contract. Because that compensation, or at least some portion of it, would presumably be lost if the arbitration panel enjoined Castlewood from performing its claims management services, it cannot be said that it appears to a legal certainty that the dispute is for less than the jurisdictional amount.

B.  Standard for Preliminary Injunction

To obtain a preliminary injunction, the movant must show "that it is likely to suffer irreparable injury if the injunction is not granted and (1) either a likelihood of success on the merits of its case or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990) (citations and internal quotations omitted); *accord AIM Int'l Trading, LLC v. Valcucine SpA.*, 188 F. Supp. 2d 384, 386-87 (S.D.N.Y. 2002). In applying this test, the "showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Reuters*, 903 F.2d at 907

8

(citations and internal quotations omitted). "The movant is required to establish not the mere *possibility* of irreparable harm, but that it is *likely* to suffer irreparable harm if relief is denied." *AIM Int'l Trading*, 188 F. Supp. 2d at 387 (citations and quotations omitted).

1. <u>Irreparable Harm</u>

Castlewood claims that it will suffer irreparable harm merely from being forced into an arbitration in which it is not contractually bound to participate. Courts regularly have held that "[c]ompelling arbitration of a matter not properly subject to arbitration constitutes 'per se irreparable harm.'" *Tellium, Inc. v. Corning Inc.*, No. 03 Civ. 8487, 2004 WL 307238, at *3 (S.D.N.Y. Feb. 13, 2004) (quoting *Mount Ararat Cemetery v. Cemetery Workers and Greens Attendants Union Local 365*, 975 F. Supp. 445, 446-47 (E.D.N.Y. 1997)); *see also Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003) ("[Plaintiff] would be irreparably harmed by being forced to expend time and resources arbitrating an issue that is not arbitrable, and for which any award would not be enforceable." (quoting *Maryland Cas. Co. v. Realty Advisory Bd. on Labor Relations*, 107 F.3d 979, 985 (2d Cir. 1997)); *Int'l Trust Co. of Berm. v. Fahnstock & Co.*, No. 95 Civ. 3865, 1995 WL 606275, at *3 (S.D.N.Y. Oct. 12, 1995) ("A party that has not agreed to arbitrate a dispute will suffer irreparable harm if it [sic] forced to submit to arbitration.") (citation omitted).

NICO nevertheless argues that "arbitration does not in itself constitute irreparable harm." (Def.'s Mem. 10.) In support of its position, NICO points to *Pompano-Windy City Partners, Ltd. v. Bear, Stearns & Co.*, 698 F. Supp. 504 (S.D.N.Y. 1998). In *Pompano*, the court found no irreparable harm in requiring plaintiffs to arbitrate absent a showing that "arbitration will necessarily be biased." *Id.* at 519. However, as Plaintiffs point out, in *Pompano*, all of the parties were signatories to the arbitration agreement, and the dispute went solely to the scope of

that agreement and the forum in which any arbitration would be held. *Id.* at 506-07. *Pompano* is therefore either distinguishable from this case or inconsistent with the clear weight of the authority in the Second Circuit. Accordingly, Castlewood meets the irreparable harm requirement for a preliminary injunction.

The irreparable harm to Seaton and Stonewall is far less obvious. Seaton and Stonewall argue weakly that their right to a speedy resolution of their disputes with NICO will be damaged if Castlewood is interjected into the arbitrations that are already underway. (Pls.' Mem. 7.) At oral argument, counsel for Seaton and Stonewall acknowledged that they can cite no case to support this theory of irreparable harm and the Court is aware of none. Therefore, the request of Seaton and Stonewall to bar Castlewood from the arbitration is denied.

    2.  <u>Probability of Success on the Merits</u>

Once irreparable harm has been established, Castlewood must also show that it has a likelihood of succeeding on the merits of the case; or, in the alternative, that there are sufficiently serious questions going to the merits to make them a fair ground for litigation and that the balance of the hardships tips in Castlewood's favor. *See Tellium*, 2004 WL 307238, at *3. Because Castlewood is not a signatory to the Reinsurance Agreement, it may be bound by that agreement's arbitration clause only if it falls within one of the "'limited theories upon which [the Second Circuit] is willing to enforce an arbitration agreement against a nonsignatory.' There are five such theories: '1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel.'" *Merrill Lynch*, 337 F.3d at 129 (quoting *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776, 780 (2d Cir. 1995)) (citation omitted). Here, NICO argues that Castlewood is subject to arbitration based on only two of those theories: assumption and estoppel. (Def.'s Mem. 13-16.)

a)   Assumption

"In the absence of a signature, a party may be bound by an arbitration clause if its subsequent conduct indicates that it is assuming the obligation to arbitrate." *Thomson-CSF*, 64 F.3d at 777 (citing *Gvozdenovic v. United Air Lines, Inc.*, 933 F.2d 1100, 1105 (2d Cir. 1991)). To be bound under this theory, a nonsignatory must "manifest[] a clear intent to arbitrate the dispute." *Gvozdenovic*, 933 F.2d at 1105; *see also In re Arbitration Between Promotora da Navegacion, S.A. v. Sea Containers, Ltd.*, 131 F. Supp. 2d 412, 417 (S.D.N.Y. 2000) ("[T]he fundamental question . . . is whether [the nonsignatory] evidenced – expressly or implicitly – an unambiguous intent to arbitrate the submitted dispute."). Here, despite devoting two pages to this exception in its Opposition Brief, NICO ultimately makes no allegation that Castlewood has ever manifested any intent to arbitrate any issue arising from the Reinsurance Agreement. *Cf. Gvozdenovic*, 933 F.2d at 1105 (party resisting arbitration "participated voluntarily and actively in the arbitration process" by sending a representative to act on its behalf). Absent such a showing, the assumption exception cannot apply.

In a variation on the assumption exception, NICO argues that one section (section 2.2 – quoted above) in each of the Administration Agreements reflects Castlewood's assumption of Seaton's and Stonewall's obligation to arbitrate. In one of these provisions, for example, Castlewood acknowledges that it has read the Reinsurance Agreements and that it will "at all times cause the services to be performed in a manner consistent with [Seaton's] rights and obligations under the Reinsurance Agreements." (Wall Decl. Exs. D § 2.2.) According to NICO, this section reflects an assumption by Castlewood of Seaton's and Stonewall's obligation to arbitrate under the Reinsurance Agreements, upon demand by NICO. To bolster this argument, NICO cites two cases for the proposition that "parties . . . assigned an original

11

signatory's rights and obligations under a contract containing an arbitration clause may demand arbitration against the counter-party." (Def.'s Mem. 14 (citing *Cedrela Transp. Ltd v. Banque Cantonale Vaudoise*, 67 F. Supp. 2d 353 (S.D.N.Y. 1999); *Certain Underwriters at Lloyd's London v. Colonial Penn Ins. Co.*, No. 97 Civ. 767, 1997 WL 316459 (S.D.N.Y. 1997))). NICO's characterization of these cases is accurate. However, given the facts at issue here, these cases are inapposite.

First, in both *Cedrela* and *Colonial Penn*, a nonsignatory to an agreement containing an arbitration clause, who had been assigned rights under that agreement, sought to compel arbitration with a *signatory* to that agreement. *See Cedrela*, 67 F. Supp. 2d at 353; *Colonial Penn*, 1997 WL 316459, at *1-2. Here, a signatory (NICO) seeks to compel arbitration with a nonsignatory (Castlewood). This is a significant distinction, as the nonsignatory cannot be said to have at any time consented to arbitrate disputes stemming from the agreement.

Second, in both *Cedrela* and *Colonial Penn*, a signatory to the arbitration agreement made a direct and unambiguous assignment of its rights to the nonsignatory. *See Cedrela*, 67 F. Supp. 2d at 353 (assignment clause transferred "all our rights and benefits under the Charter"); *Colonial Penn*, 1997 WL 316459, at *1 ("Mutual Fire assigns to Colonial Penn all of its rights under [the agreement]."). Here, neither Seaton nor Stonewall has assigned any rights to Castlewood. Rather, they have contracted to ensure that Castlewood will not do anything that will cause either Seaton or Stonewall to breach the Reinsurance Agreements. If Castlewood does cause either insurer to breach, then those insurers have a right, under the Administration Agreements, to seek relief against Castlewood. However, nothing in this section obligates Castlewood to meet NICO in an arbitration hearing. Indeed, NICO appears to recognize that no assignment has been made, as NICO argues only that "Castlewood entered the Administration

Agreements with full knowledge of the Insurers' obligations under the Reinsurance Agreements" (Def.'s Mem. 14), but does not definitively state that the Administration Agreements constituted an assignment of rights under the Reinsurance Agreements.

          b)      <u>Estoppel</u>

When a nonsignatory to an agreement with an arbitration clause "knowingly exploit[s] the agreement, . . . [it is] estopped from avoiding arbitration despite having never signed the agreement." *Thomson-CSF*, 64 F.3d at 778; *see also MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58, 61 (2d Cir. 2001). This exception only applies, however, where the benefits that the nonsignatory receives from the agreement are "direct – which is to say, flowing directly from the agreement." *MAG Portfolio*, 268 F.3d at 61 (citation omitted); *see also Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993) (holding that where a nonsignatory to a licensing agreement makes use of a trade name pursuant to that agreement, it is estopped from avoiding the arbitration clause found in the licensing agreement).

NICO argues that Castlewood should be estopped from contesting arbitration because Castlewood has benefitted from the Reinsurance Agreements by virtue of its later agreements with Seaton and Stonewall. In particular, NICO points to the provision in the Administration Agreements governing arbitration between the signatories to those Agreements,[5] and to a

---

[5]"In the event that any differences arising [sic] between [Seaton/Stonewall] and Castlewood under this Agreement, such differences shall be submitted to arbitration." (Wall Decl. Exs. D § 15.7, E § 15.7.)

13

covenant in the Stock Purchase Agreement requiring that Castlewood use all commercially reasonable efforts to obtain NICO's consent to Castlewood's serving as Claims Servicer.[6]

From NICO's perspective, its dispute with Seaton and Stonewall is "clearly intertwined with Castlewood's Administration Agreements, both of which contain agreements to arbitrate." (Def.'s Mem. 16.) Further, as NICO sees it, "these disputes were forecasted by Castlewood" and the insurers when they agreed to seek NICO's consent to having Castlewood be the Claims Servicer. (*Id.*) This all means, in NICO's view, that the "Insurers' efforts to wrest control of claims servicing and to give that control to Castlewood is at the center of the disputes before the arbitration panels." (*Id.*)

NICO's argument never gets off the ground. First, any benefits gained by Castlewood arise only indirectly, by virtue of the separate Administration Agreements with Seaton and Stonewall, and not directly from the Reinsurance Agreement. While it may be that this benefit is contrary to Seaton's and Stonewall's obligations under the Reinsurance Agreements, that fact only permits NICO to exercise its right to arbitration under those contracts, and only against the parties who contracted to be bound to arbitration for alleged breaches of those contracts. Second, NICO cannot seek to invoke the arbitration clauses of the Administration Agreements as the arbitration in play was not triggered by those contracts. Nor are the parties to those agreements in arbitration. Finally, the cases cited by NICO are inapposite in that they merely hold that a non-signatory may compel a signatory to arbitrate under an agreement that it signed or permit a non-signatory to join an arbitration involving two signatories. Although the Second

---

[6]"The parties shall each use commercially reasonable efforts to cause Castlewood US to obtain, as expeditiously as possible . . . [NICO's] consent to Castlewood US . . . serving as the Claims Servicer (as such term is defined in the Stonewall Reinsurance Agreement)." (Snover Decl. Ex. 4 § 5.10.)

Circuit has held that, under some circumstances, a court will "estop a *signatory* from avoiding arbitration with a nonsignatory," *Thomson-CSF*, 64 F.3d at 779, the question of whether Castlewood (a nonsignatory) can be compelled to arbitrate issues relating to the Administration Agreements (as opposed to the Reinsurance Agreements) is not before this Court.  NICO has cited no support in the law – and none has been found – for the much broader proposition that a nonsignatory can compel a signatory *to one agreement* to engage in arbitration regarding a *wholly different agreement*.

For the foregoing reasons, the Court finds that Castlewood has met its burden of establishing a likelihood of success on the merits.[7]

C.  Issuance of a Security Bond

Rule 65(c) states in pertinent part:  "No . . . preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  "The purpose of this provision is to enable a restrained . . . party to secure indemnification for the costs . . . and pecuniary injury that may accrue during the period in which a wrongfully issued equitable order remains in effect."  11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal*

---

[7]In its opposition brief, NICO does not claim that Castlewood is required to arbitrate based on any theories other than assumption and estoppel.  Accordingly, the Court does not address the three remaining theories upon which a non-signatory can be compelled to arbitration.  Further, because the Court finds that Castlewood has established both irreparable harm and a likelihood of success on the merits, it need not address the balance of hardships.  That said, the balance decidedly tips in Castlewood's favor, as it would be forced to expend time and other resources to defend itself in an arbitration it did not agree to, while NICO admits that it can obtain the relief it seeks by binding Seaton and Stonewall through the arbitration process, and, to the extent it needs relief against Castlewood, it always can bring an action against it in court.

*Practice and Procedure* § 2954 (2d ed. 1995).  "[T]he rule is phrased in mandatory terms and the conclusion seems inescapable that once the court decides to grant equitable relief under Rule 65 it must require security from the applicant."  *Id.*  However, "the District Court is vested with wide discretion in the matter of security and it has been held proper for the court to require no bond where there has been no proof of likelihood of harm."  *Doctor's Assocs. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996); *see also AIM Int'l Trading, L.L.C. v. Valcucine S.P.A.*, No. 02 Civ. 1363, 2002 WL 1285557, at *7 (S.D.N.Y. June 11, 2002) (noting courts' "wide discretion" in determining size of bond).

NICO argues that Castlewood is currently in "possession or with access to [NICO's] asset."  (Def.'s Mem. 18.)  Specifically, "NICO's remaining $190 million cover for Seaton and $185 million cover for Stonewall is exposed to Castlewood" and, absent arbitration, Castlewood will be able to misuse NICO's funds.  (*Id.*)  Plaintiffs deny that Castlewood has access to NICO's funds:  "NICO writes its own checks . . . [and] has the ability to refuse to reimburse Seaton or Stonewall for any claim paid."  (Reply Mem. of Law in Further Supp. of Pls.' Order to Show Cause for Inj. Relief 11.)  Moreover, Plaintiffs argue that even if a preliminary injunction is granted, NICO will still be able to continue its ongoing arbitrations with Seaton and Stonewall, and that therefore any injury to NICO's interests under the Reinsurance Agreement can be addressed in those arbitration proceedings, irrespective of Castlewood's participation.  (*Id.*)

On the evidence presently before the Court, it appears that NICO's potential injury is slight, if any, and therefore a bond of $100 million is excessive.  However, the Court believes that a bond in the amount of $1,000,000 is appropriate.  *See AIM Int'l Trading*, 2002 WL

1285557, at *8 (requiring plaintiff to post a bond of $50,000 where defendant had requested a bond of $800,000).

### III. Conclusion

For the reasons discussed herein, Castlewood's request for a preliminary injunction prohibiting NICO from bringing any arbitration proceeding against Castlewood, pursuant to the Reinsurance Agreements, is GRANTED. The same request of Seaton and Stonewall is DENIED.


SO ORDERED.

Dated: October 24, 2006
       New York, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

Service List:

John Francis Finnegan, Esq.
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, NY 10281
Fax: (212) 504-6666
*Counsel for Plaintiff Castlewood*

Derrick R. Freijomil, Esq.
Michael Robert O'Donnell, Esq.
Riker Danzig Scherer Hyland Perretti LLP
One Speedwell Ave.
Morristown, NJ 07962
Fax: (973) 451-8622
*Counsel for Plaintiffs Seaton Insurance Company and Stonewall Insurance Company*

Larry P. Schiffer, Esq.
Leah Mary Campbell, Esq.
Leboeuf, Lamb, Greene & MacRae, LLP
125 West 55th Street
New York, NY 10019
Fax: (212) 649-9493
*Counsel for Defendant*